**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA          :

    v.                                                    :          **CRIMINAL NO. 3:24-308**

**FRANK SUESS,** *et al.,*                      :              **(JUDGE MANNION)**

       **Defendants**                  :

**<u>MEMORANDUM</u>**

Pending before the court is defendant Melissa Driscoll's motion *in limine* to exclude evidence pursuant to Federal Rule of Evidence 404(b). (**Doc. 198**). For the reasons stated herein, the motion will be **DENIED**.

## I.    BACKGROUND

On November 13, 2024, a federal grand jury issued a 55-count indictment against defendants Frank Suess, Melissa Driscoll, Luis Salgado, Victor Velazco, Warren Pizik, Dave Singh, and Diana Castro. (Doc. 1). The indictment charged the defendants with conspiracy to commit healthcare fraud, in violation of 18 U.S.C. §1349, ten counts of health care fraud, in violation of 18 U.S.C. §1347, and all but Castro with an additional ten counts of healthcare fraud. *Id.* Additionally, the indictment charged Suess, Velazco, Salgado, Pizik, and Driscoll with conspiracy to violate the anti-kickback statute, in violation of 18 U.S.C. §371, and sixteen counts of violation of the anti-kickback statute, in violation of 42 U.S.C. §§1320a-7b(b)(1)-(2). *Id.* It

further charged Suess, Velazco, and Driscoll with another thirteen counts of violation of the anti-kickback statute, conspiracy, in violation of 18 U.S.C. §371, obstruction of criminal investigations of health care offenses, in violation of 18 U.S.C. §1518, and two counts of destruction, alteration, or falsification of records in Federal investigations, in violation of 18 U.S.C. §1519. *Id.*

The charges stem from an alleged fraud scheme in which medically unnecessary prescriptions for "footbaths," containing a variety of prescription drugs, and solicited by marketers, were filled, netting profits for the owners of the pharmacies filling them and their co-conspirators. (Doc. 1).

On March 20, 2026, Driscoll filed the present motion and an accompanying brief in support. (Docs. 198, 199). On April 10, 2026, the Government filed a brief in opposition. (Doc. 218). On April 24, 2026, Driscoll filed a reply to the Government's brief in opposition. (Doc. 233). The motion is thus ripe for disposition.

## II.    LEGAL STANDARD

"The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." *United States v. Tartaglione*, 228 F.Supp.3d 402, 406 (E.D.Pa. 2017). On a motion *in limine*, evidence should only be excluded "when the

- 2 -

evidence is clearly inadmissible on all potential grounds." *Id.* Evidentiary rulings on motions *in limine* are subject to the trial judge's discretion and are therefore reviewed for an abuse of discretion. *Abrams v. Lightolier*, 50 F.3d 1204, 1213 (3d Cir. 1995); *Bernardsville Bd. Of Educ. v. J.H.*, 42 F.3d 149, 161 (3d Cir. 1994). "The Court is vested with broad inherent authority to manage its cases, which carries with it the discretion and authority to rule on motions *in limine* prior to trial." *Ridolfi v. State Farm Mutual Auto. Ins. Co.*, 2017 WL 3198006, *2 (M.D.Pa. 2017). Further, "[c]ourts may exercise this discretion in order to ensure that juries are not exposed to unfairly prejudicial, confusing or irrelevant evidence." *Id.*

"A trial court considering a motion *in limine* may reserve judgment until trial in order to place the motion in the appropriate factual context." *Tartaglione*, 228 F.Supp.3d at 406. "Further, a trial court's ruling on a motion *in limine* is 'subject to change when the case unfolds, particularly if actual testimony differs from what was contained in the movant's proffer.'" *Id.* (quoting *Luce v. United States*, 469 U.S. 38, 41 (1984)).

## III.    DISCUSSION

Evidence of prior bad acts "may be admissible" to "prov[e] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

- 3 -

Driscoll challenges the Government's intent to offer: (1) evidence relating to Total Home Health Care ("THHC"), a pharmacy acquired by her father in 2015, (2) evidence relating to phone conversations she had with a Highmark Blue Cross investigator in 2018, and (3) testimonial evidence from an individual associated with Instinctive Edge LLC, a third-party marketer used by Sterling Pharmacy from 2018 until 2021.

### A. Evidence relating to THHC

The Government asserts that defendant Suess "was a known bad actor whose companies had been terminated from pharmacy networks by large [PBMs]," and that Driscoll knew that and "underst[ood] that a core aspect of the conspiracy was to conceal the involvement of Suess . . . in the operations of Sterling Pharmacy." (Doc. 199-1 at 3). Accordingly, the Government intends to admit evidence relating to THHC under the theory that:

> In order to circumvent PBM restrictions, Suess and Velazco financed the purchase of pharmacies by third parties and then used those pharmacies to conduct the lucrative mail-order business that was one of the reasons for Suess's termination from PBM networks. Driscoll entered into this conspiracy through [THHC] and then quickly pivoted to Sterling Pharmacy once the former could no longer continue doing business. Driscoll and a family member, V.H., acquired control of

- 4 -

[THHC], an independent, brick-and-mortar pharmacy located in Stroudsburg, PA, in or about 2015. V.H. was listed as the owner of THHC, and Driscoll was the manager.

*Id.* Furthermore, the Government claims that "[e]vidence at trial will show that [THHC] was associated with Suess . . . that the pharmacy was operated with the assistance of known Suess associates . . . [that] [i]n the approximately two years that it was run by Driscoll and her father, THHC had approximately $17.5 million in gross sales . . . and it paid almost $8 million in 'management fees' . . . [and that in addition to Driscoll and her father,] Suess was also listed on the THHC [bank] account." (Doc. 218 at 7).

The Government argues that the evidence is admissible under Federal Rule of Evidence 404(b) as evidence of knowledge, motive, plan, intent, lack of mistake, and lack of accident. Specifically, the Government proffers that: (1) "witness testimony will establish Driscoll and V.H.'s shared understanding, in 2017, that THHC could no longer do business due to the cancellation of its contracts with PBMs. This reality is what led to Driscoll's acquisition of Sterling Pharmacy, and it was the same outcome that Sterling Pharmacy ran into just a few years later. Thus, it is relevant to Driscoll's knowledge, motive, plan, and intent," (2) "THHC represents classic 'common scheme or plan' evidence. Like Sterling pharmacy, THHC was utilized to conduct mail-order business focusing on high-reimbursement prescription

products, and, like Sterling Pharmacy, its concentration on mail-order business was concealed from PBMs," and (3) "THHC demonstrates why Driscoll, specifically, became the owner of Sterling Pharmacy following THHC's termination by PBMs. When taking over Sterling Pharmacy, Driscoll understood that if a prior blacklisted individual—such as Suess and now, V.H.—were the nominal owner of Sterling pharmacy, that would require disclosure and likely lead to Sterling Pharmacy not obtaining PBM enrollment." (Doc. 199-1 at 4). As the Government notes: "In sum, evidence regarding THHC is admissible because it directly maps onto the permissible purposes identified in Rule 404(b) and because it 'completes the story' by providing critical background information . . . [to the] criminal conduct through Sterling Pharmacy." *Id.* at 5. The court agrees.

The THHC-related evidence tends to demonstrate that Driscoll was knowledgeable with respect to the charged conspiracy scheme, its aims, and its methods. Relatedly, her knowledge tends to demonstrate absence of mistake and lack of accident. Furthermore, the THHC evidence, placed in relation to the charged fraud scheme, supports the theory that Driscoll's motive was profit-driven, as the lucrative nature of the THHC business relationship with Suess lends itself to the conclusion that Driscoll wished to continue the relationship through Sterling Pharmacy. Similarly, the evidence

- 6 -

tends to demonstrate that Driscoll was not an unwitting participant in the fraud scheme, but rather a willful one. In other words, it is evidence of intent. Finally, the closing of THHC and opening of Sterling Pharmacy in a short timeframe, in conjunction with the sustained business relationships and the nature of the operations of the two pharmacies, shows a common plan or scheme. Thus, the evidence is admissible under Rule 404(b).

### B. Evidence relating to Driscoll's 2018 phone calls with a Highmark Blue Cross investigator

Driscoll seeks to exclude evidence of two telephone conversations with an investigator from Highmark Blue Cross in 2018. During the first phone call:

> [The] investigator explained that she was reaching out because of "complaints" in which people were claiming that orders for prescription pain creams filled by Sterling Pharmacy were "fake" and a "fraud." The investigator further explained that there was a "scam going on around the country" and that it tended to involve orders for a "large volume of topical cream." The investigator asked Driscoll whether she was familiar with faxed order forms with Sterling Pharmacy's name on it that were going to doctors' offices and were causing complaints. Driscoll claimed that she was "not sure" and needed to "look into it to see what it is."

(Doc. 199-1 at 5).

- 7 -

After this call, the investigator faxed Driscoll a copy of an order form for Driscoll to review. Two weeks later, the investigator called Driscoll again, and asked her whether she had looked at it:

> Driscoll acknowledged that the prescription "look[ed] like our paperwork." The investigator explained that she had four or five such forms in front of her and that they all resulted in complaints, including one stating, "This is fraud."

> After further discussion, the investigator stated, "Melissa, I'd really like you to be up front with me because this is a national problem that I see . . . it's just a money generator . . ." Driscoll interjected, "That's why I wanted to look into it. I don't, I don't understand why, what happened with it."

> The investigator then explained the enormous amount of lidocaine pain cream that one prescription ordered for a patient, supposedly for a 90-day supply. The investigator asked point blank whether the prescription form that she had provided to Driscoll following the first call was from Sterling Pharmacy or from a marketing company that Driscoll had hired. Driscoll stammered in response and then fell silent. The investigator continued, "If the prescription's not been filled, then no crime has been committed. I'm trying to understand are you involved in this or not." Driscoll then claimed that she needed to look into the matter further. The investigator then explained that there were "federal investigations" into the parties employing such marketing practices. She explained

that "these telemarketing companies are not in this for helping the patient. They're in this to solicit and sell creams and goods to the patient."

The investigator stated, "So if you're working with somebody, you'd like to help us out, that would be great so we can get to the bottom" of the matter. "I would love for you to be able to provide us any information. I don't want to see any more of these come across my desk . . . I sense your reluctance to tell me what's really going on." Driscoll again claimed that she "just want[ed] to look into it more," at which point the investigator raised that she had contacted Driscoll two weeks prior. Driscoll then said, "If I come up with something, I'll reach out to you." There is no evidence that Driscoll contacted Highmark Blue Cross to provide additional information following these calls.

In closing, the investigator referred to an online article on this subject and told Driscoll, "You just have to Google 'lidocaine fraud.'" Driscoll said that she would look at this information.

*Id.* at 5-6.

Despite these phone calls, "Sterling Pharmacy billed for a large amount of prescription pain creams, including lidocaine, until 2021, when it abruptly shuttered." *Id.* Further, the Government asserts that "[a]t trial, evidence will show that the 'foot bath' scheme was a variant on well-established and

- 9 -

common schemes involving pain creams, such as those that Suess, Velazco, and Driscoll had been involved in for several years." *Id.*

These conversations are admissible under Rule 404(b) as they demonstrate knowledge, plan, absence of mistake, and lack of accident. Even if Driscoll had been unaware of any fraud schemes prior to the phone calls, the investigator put her on notice about the nature of pain cream fraud schemes, which bear substantial similarity to the alleged footbaths fraud scheme. Thus, the continued fulfillment of prescriptions for footbaths for years following these calls renders the evidence admissible under 404(b).

### C. Evidence from a third-party marketer at Instinctive Edge

The Government intends to introduce, at trial, "the testimony of an individual associated with Instinctive Edge LLC, a third-party marketer used by Sterling Pharmacy from in or around mid-2018 until around mid-2021." (Doc. 199-1 at 6). According to the Government:

> During this time period, Sterling Pharmacy paid Instinctive Edge over $500 thousand for referring insurance beneficiaries to Sterling Pharmacy so that Sterling Pharmacy could issue prescription drugs to them. This witness will provide key testimony about the modus operandi that Suess, Velazco, and Driscoll utilized. Specifically, he will testify to how Suess and Velazco had serial relationships with pharmacies, which generally operated for a few years before being closed down .

- 10 -

. . [and Driscoll's] shared understanding of this modus operandi.

*Id.*

This evidence is intrinsic to the crimes charged, as the movement from one pharmacy to the next was a central aspect of the alleged fraud scheme. *See United States v. Green*, 617 F.3d 233, 248-49 (3d Cir. 2010) (First, evidence is intrinsic if it 'directly proves' the charged offense . . . Second, 'uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime") (internal citations omitted). To the extent that Driscoll argues the evidence is extrinsic and inadmissible under Rule 404(b), the evidence would still be admissible as evidence of knowledge, intent, and plan.

## IV.    CONCLUSION

For the foregoing reasons, Driscoll's motion to exclude evidence pursuant to Federal Rule of Evidence 404(b) will be **DENIED**. An appropriate order shall issue.

**MALACHY E. MANNION**
**United States District Judge**

DATE: 5/20/26

24-308-09

- 11 -